**Moses E. SALYER, Plaintiff,**

**v.**

**Elliot L. RICHARDSON, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 71–C–168–A.**

United States District Court,
W. D. Virginia,
Abingdon Division.

July 20, 1972.

Carl E. McAfee, Norton, Va., for plaintiff.

Birg E. Sergent, Asst. U. S. Atty., Roanoke, Va., for defendant.

## OPINION

WIDENER, Chief Judge.

This is an action under § 205(g) of the Social Security Act, 42 U.S.C. § 405 (g), to review a final decision of the Secretary of Health, Education and Welfare. On September 26, 1969, claimant filed application to establish a period of disability and for disability insurance benefits, alleging that he first became unable to engage in substantial work on September 5, 1969. The Bureau of Disability Insurance disallowed claimant's application, so advising him by letter dated June 2, 1970. Upon claimant's request, his application was reconsidered, and it was again rejected on October 12, 1970. Claimant thereupon requested a hearing, which likewise resulted in denial of his claim. The hearing examiner's decision became the final decision of the Secretary on October 18, 1971, when the Appeals Council denied claimant's request for review.

To qualify for disability insurance benefits and a period of disability under §§ 223 and 216(i) of the Act, 42 U.S. C. §§ 423 and 416(i), an individual must meet the insured status requirements of these sections, be under age 65, file an application for disability insurance benefits and a period of disability, and be under a disability as defined in the Act. The term disability is defined in § 223 to mean:

"(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; * * *

"(B) * * *

"(2) For purposes of paragraph (1) (A)—

"(A) an individual * * * shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such

individual lives or in several regions of the country.

"(B) * * *

"(3) For purposes of this subsection, a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

"(4) * * *

"(5) An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."

For purposes of establishing a period of disability under § 216(i) of the Social Security Act, the same disability provisions as contained in § 223(d) (1) (A), (2) (A), (3) and (5) of the Act, quoted above, are applied.

■■ It is not questioned that plaintiff does suffer from some mental or physical impairments. The only issue therefore is whether such impairments render plaintiff unable to engage in any substantial gainful activity as required by the statute. Of course, the Secretary's determination that plaintiff is not incapable of engaging in such substantial gainful activity must be affirmed if there is substantial evidence to support the decision. Durham v. Gardner, 392 F. 2d 168, 169 (4th Cir. 1968); 42 U.S.C. § 405(g). In its determination of whether there is substantial evidence that plaintiff is unable to engage in substantial gainful activity, the court must consider (1) objective medical facts (which are the clinical findings of examining or treating physicians divorced from their expert opinions or judgment as to the significance of these findings); (2) the medical opinions of these physicians; (3) the subjective evidence of pain and disability testified to by the claimant and corroborated by other evidence, and (4) claimant's background, work history and present age. Cyrus v. Celebrezze, 341 F.2d 192 (4th Cir. 1965); Hicks v. Gardner, 393 F.2d 299 (4th Cir. 1968).

The transcript shows that plaintiff is a 44-year-old male with a sixth grade education; he professes only slight ability to read and write. He is married and currently lives at home with his wife and 11-year-old male child. His 18-year-old daughter is married and not living in his household. Plaintiff has spent most of his working life in the coal mines (since 1946), although before going into the mines he worked in a butcher's shop as a butcher's helper, and before that as a laborer on a railroad track gang. While in the mines, plaintiff worked as a roof bolter, a job he describes as using a machine like an inverted jack-hammer to bolt supports to the roof of the mine. This work is done at the face of the mine and plaintiff described the work area as extremely dusty, often so much so that he could not see to work and had to wait for the dust to clear.

On September 5, 1969, plaintiff stopped going to work. He testified that he just could not go any more and, in his own words, "My chest hurt me. I couldn't breathe. I couldn't sleep. I had to sit up in bed." Plaintiff further testified that his chest hurt worse now than ever, that he loses his breath whenever he tries to move around very much and that his strength leaves him if he "move[s] very much."

The hearing also revealed that plaintiff suffers impaired use of his hands. He has difficulty in extension of the fingers although flexion is accomplished fairly easily and he makes a good fist. He is able to feed and bathe himself unassisted and apparently without difficulty. Plaintiff says that his hands have always been "crooked," but only in the past three years has he experienced weakness in them. He states that he can no longer milk a cow, yet the court takes notice of the fact that such a task is one requiring a very great amount of strength in the hands and by no means of itself would indicate inability to use his hands for other things.

Plaintiff also claims to have a problem with his nerves, although his testimony on this is very vague. As to his

nerves, plaintiff seems to be saying that he is nervous a lot and that his legs sometimes go to sleep.

Plaintiff's wife testified at the hearing and largely substantiated what plaintiff had said concerning chest pains, shortness of breath, loss of strength, nervousness and weakness of the hands. She further stated that recently the plaintiff at times does not seem to know where he is or what he is about. The sum of the testimony of plaintiff and his wife seems to be that plaintiff just cannot do anything but sit around the house.

The medical evidence, on the other hand, is not so favorable. There is a report in the record from Dr. James Spencer Henry, a general practitioner, relating to a hospitalization of claimant in August, 1968. The report indicates that plaintiff complained of a digestive disorder. The report is rather vague, containing no statements of diagnosis or treatment. The record is devoid of further digestive disorders. Dr. Henry's report also mentions a broken ankle treated by a Dr. Brilhart, of Abingdon, which appeared to be healing "nicely."

In a report dated February 6, 1970, Dr. Samuel Miller, a general practitioner, indicates that he had seen plaintiff on several occasions beginning with July 11, 1969, with the last examination on the date of the report. Physical and laboratory findings were not extraordinary, the diagnosis being that of depression, possible tuberculosis (positive TB test), and early, minimal silicosis. Dr. Miller's physical examination indicated that the chest was entirely normal.

Dr. G. Hunter Wolfe, a general practitioner, in a report dated February, 1970, indicated that he first saw claimant in September, 1969 and had seen him at about two-week intervals since that time. An attempted ventilatory function study was not completed due to the fact that plaintiff indicated that he could not participate in the breathing capacity part of the test. Chest x-rays of October, 1969 showed multiple small nodular densities in both lung fields and indicated some progression of plaintiff's silicosis since x-rays of July 10, 1969. Plaintiff's silicosis was classified as Grade I.

A brief report from Dr. Robert F. Baxter in September, 1969 states that x-rays, pulmonary function studies and physical examination revealed that claimant had early second stage silicosis. Only these conclusions were stated in the report; no actual clinical data was included.

Dr. John Munal, a general practitioner and general surgeon, indicates in a report dated October 21, 1969 that he had x-rayed claimant on September 6, 1969. He interpreted his x-rays to show "Pulmonary fibrosis advanced." Dr. Munal's pulmonary function studies showed 37% of normal vital capacity.

A boards certified specialist, Dr. William F. Schmidt, x-rayed plaintiff's chest on September 22, 1969. He ruled out superimposed tuberculosis but interpreted the chest films to show "soft coal workers' Pneumoconiosis, Category 2–p."

Plaintiff was referred to North Carolina Baptist Hospital by his own physician, Dr. Wolfe. Diagnosis based on his stay there from December 22, 1969 through December 30, 1969 was that of anthracosilicosis and chronic anxiety. He was again admitted to that institution on January 12, 1970 for additional evaluation. Plaintiff was examined there by Dr. J. L. Heaphy, a specialist in pulmonary diseases. Again, the report indicated a finding of chronic depression and anthracosilicosis. Plaintiff was found to have no tuberculosis and respiration was regular at 20, although mild airway obstruction was noted. The report also indicated the presence of a psychosomatic overlay.

On March 18, 1970, plaintiff was examined at the Southern West Virginia Clinic by Dr. Jose L. Oyco, a specialist in internal medicine. Dr. Oyco conducted an extensive physical examination which showed only slight deviations from normality. HEENT, gastrointestinal, genitourinary, musculoskeletal and endocrine and emotional examinations were all essentially normal. The silicosis se-

ries showed Pneumoconiosis "category II q, nodulation consistent with silicosis and slight diffuse hyperventilation of the lungs. The PES showed pneumoconiosis category II–III p, I–II q. The final diagnosis was Pneumoconiosis, category III p, and mild pulmonary emphysema.

While at the clinic, plaintiff underwent pulmonary function studies conducted by Dr. D. L. Rasmussen, a boards certified specialist in internal medicine and a sub-specialist in pulmonary diseases. Pulmonary mechanics were found normal. Ventilatory studies suggested minimal obstructive insufficiency. Dr. Rasmussen noted "The tracings do suggest, however, less than a fully maximum effort. The maximum breathing capacity is minimally reduced. The observed value is below that of the calculated value of 131 liters per minute, suggesting that the patient is probably capable of a nearly normal effort." Blood gas studies showed normal intrapulmonary blood gas mixing with exercise on the tread mill at 1½ mph at 0 grade, and 2 mph at 5, 10, and 15% grade levels. At the 10% grade levels, some abnormalities were shown. It was noted that plaintiff could complete the test on the 15% level with some difficulty, "but no obvious respiratory distress." According to Dr. Rasmussen, the studies conducted tended to indicate the presence of relatively mild pulmonary parenchymal obstruction. He further stated that plaintiff's physiologic abnormalities are observed frequently among symptomatic bituminous coal workers from southern West Virginia, eastern Kentucky and southwestern Virginia. Dr. Rasmussen concluded that the patient appears to be capable of performing work at barely moderate work levels and that a numerical estimate of the overall loss of functional capacity in this case would be placed in the neighborhood of 35–40%, such loss being consistent with plaintiff's occupational exposure.

At the request of the Virginia State Department of Vocational Rehabilitation, the claimant was examined by Dr. J. V. Abad, a specialist in internal medicine. The plaintiff's overall condition was found to be within normal ranges with the exception of maximum breathing capacity which was listed at 36% of the predicted maximum. Dr. Abad's diagnosis was that there is no evidence of silicosis or pulmonary emphysema and that there is no significant ventilatory insufficiency. The doctor noted further that the plaintiff did not cooperate in the performance of the pulmonary function tests.

The Virginia Agency further requested a psychiatrist, Dr. Gordon Blackford, to examine plaintiff. This examination took place on August 20, 1970. The psychiatrist found that plaintiff was well oriented and rational, exhibiting no delusions or obsessive trends. He also found that plaintiff functions in the range of dull-normal intelligence and that he is competent to handle funds. The doctor stated that plaintiff's mood was moderately apathetic and his attitude marked by overt resentment. The diagnosis was that the patient suffered from Psychoneurotic reaction, Anxiety type, with some depressive trends.

On February 22, 1971, plaintiff was examined by Dr. James L. Gardner, a boards certified specialist in orthopedic surgery. This examination concerned primarily the assessment of the abnormalities of the fourth and fifth fingers of both hands. Plaintiff informed the doctor that the appearance of his hands at the present time is essentially the same as he recalls all his life. Physical examination showed "extensive deformities" of the middle phalangeal joints of the fourth and fifth fingers of both hands and flexion contractures of the proximal interphalangeal joints of the same fingers. There also appeared to be some muscle atrophy, although the hands showed no sensory deficit to pin prick and position sense appeared to be normal. The doctor also reported considerable loss of the hypothenar eminence of both hands secondary to muscle atrophy, meaning that plaintiff is unable to fully utilize the muscle tissue located in the

**1214**

palm below the little finger. The doctor concluded that the condition of plaintiff's hands ". . . . is certainly a disability to this gentleman of a significant degree in regards to use of his hands for manual labor."

Dr. William F. Clarke, a general practitioner, submitted results of a chest x-ray of plaintiff taken April 14, 1971, interpreted in terms of UICC/Cincinati classifications. He interpreted the x-rays to show type p and q small rounded opacities with a ⅔ profusion in all lung zones. He made a diagnosis of coal worker's Pneumoconiosis and indicated that he found claimant to be "permanently and totally disabled for all work in a dusty environment and for all manual labor."

On January 7, 1971, Dr. David Wayne, a boards certified specialist in psychiatry, saw claimant for a neuro-psychiatric consultative medical examination. Dr. Wayne's diagnostic impressions were: (1) Anxiety Neurosis, mild, chronic (2) Dull normal range of intelligence, I.Q. of 83. The doctor stated that he felt that most of the plaintiff's disability should be based upon his physical difficulties. It was further stated that plaintiff's psychiatric condition would probably worsen.

At the hearing of plaintiff's claim for benefits, a vocational witness, Dr. Norman E. Hankins, was called. Dr. Hankins holds a doctorate in guidance and counseling, has experience in rendering vocational evaluations and has a working knowledge of the vocational or job situation in this region of the country. He has personally visited most of the manufacturing establishments in East Tennessee and he states that he is familiar with the jobs in that area.

Dr. Hankins heard all the testimony at the hearing and studied the medical reports relating to plaintiff's case. Dr. Hankins took the stand and the hearing examiner inquired of the availability of jobs for a person in plaintiff's condition. The questions to Dr. Hankins took the form of hypothetical questions in which the hearing examiner asked the witness to make certain assumptions concerning plaintiff's condition. The court, having carefully reviewed the questions put to the vocational witness, is of opinion that the examiner resolved the medical evidence, in great part if not wholly, in favor of the plaintiff in describing his findings of the medical condition of plaintiff to the vocational witness.

The witness testified that there would be some jobs existing in the economy which claimant would have the capacity to perform. He described such jobs which are primarily sedentary in nature where the person could alternately sit or stand, but where he would not have to engage in heavier kinds of exertion which his limitations would rule out. More specifically, Dr. Hankins described jobs such as an inspector of rubber gloves at a nearby factory. The inspector sits at a table in front of a slow moving conveyor and examines the gloves for holes. At the same plant, jobs exist for folders who fold the gloves in the desired position for packaging, and packagers who put the folded gloves in cardboard boxes. Dr. Hankins testified that approximately four hundred of such jobs exist at the Pharmaseal Corporation in Johnson City, Tennessee.

Dr. Hankins described other jobs which exist in Gray, Tennessee, that of a pile-up assembler and a stripper. The pile-up assembler places strips of metal, about 2 inches by 8 inches upon a plate which has two pins protruding upwards; the pins accommodate the holes located in each piece of metal. The stripper inserts the loose ends of a woven wire into a cutter which trims off the loose ends. Dr. Hankins said about forty of these jobs exist. He stated further that about a hundred jobs exist in Bristol, Tennessee as a checker, a job involving inserting a two-inch piece of metal into a slide gauge and checking the needle to see that the piece of metal is the proper size. The number of these jobs which are available is decreasing now that the factory is getting fewer government contracts.

Dr. Hankins testified that, in his opinion, in light of the mental and physical condition of plaintiff, and in light of plaintiff's age and education, plaintiff would have the residual capacity to perform these jobs.

It must be remembered that the Social Security Act requires, as a prerequisite for eligibility for benefits in a case such as this, plaintiff be unable to engage in any substantial gainful activity. The Act specifically states that not only must plaintiff be unable to do his previous work but that he also must be unable to ". . . engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." § 223(2) (A) of the Act, 42 U.S.C. § 423(2) (A).

It is manifest from the evidence that plaintiff was unable to return to his job at the coal mines. It became, therefore, the burden of the Secretary to demonstrate that there are jobs available in the economy which the claimant was capable of performing. Hicks v. Gardner, 393 F.2d 299 (4th Cir. 1968). The court is of opinion the determination of the hearing examiner, which was not disturbed by the Appeals Council, that plaintiff possesses residual capacity to engage in substantial gainful activity and that jobs are available within the meaning of the Act, is supported by substantial evidence, and is conclusive.

■ The record contains the reports of over fourteen physicians touching all aspects of plaintiff's mental and physical condition. The record shows that the hearing examiner considered them all, and, viewing the record as a whole, it cannot be said that the hearing examiner lacked substantial evidence for his determination. The hearing examiner assumed as correct the greater part of the medical evidence which supported the greatest degree of disability. While it is true that Dr. Clark, a general practitioner, stated in his opinion that plaintiff was "permanently and totally disabled for all work in dusty environment and for all manual labor," the Secretary is entitled to give greater weight to the opinion of a physician specializing in the field of plaintiff's impairments rather than an opinion of a general practitioner. Durham v. Gardner, 392 F.2d 168 (4th Cir. 1968). The hearing examiner assumed mild to moderate silicosis, limited strength and use of the hands, neurotic anxiety depression, inability to engage in forms of activity calling for extensive amounts of walking or work involving repetitive movements involving squatting, stooping or bending, and incapacity to engage in arduous or strenuous types of work activity of any sort. As the review of the medical evidence earlier in this opinion shows, all of these assumptions are supported by substantial evidence. It also appears that the ailments of the plaintiff were considered in combination; they were not fragmented in evaluating their effect. Cf. Hicks v. Gardner, 393 F.2d 299 (4th Cir. 1968).

■ Furthermore, it appears that the various jobs described by the vocational witness are within the residual capacity of the plaintiff. Of course, the average man is not the standard to be used; there must be evidence to show the reasonable availability of jobs which this particular claimant is capable of performing. See, Cyrus v. Celebrezze, 341 F.2d 192 (4th Cir. 1965); Pearman v. Ribicoff, 307 F.2d 573 (4th Cir. 1962). The jobs described by the vocational witness involve work which is of a sedentary nature, are routine and require little exertion. The jobs require no more use of the hands than that of which plaintiff appears capable. The jobs require little communication and should, thus, not provoke stress or anxiety.

The court is of opinion, considering the medical facts, the opinions of the physicians reporting the medical facts, the subjective evidence of the plaintiff, and the plaintiff's age, education, background and work history, that the determination of the Secretary is support-

ed by substantial evidence and is thus affirmed.

The court notes that the plaintiff may qualify for benefits at least until September, 1974, and one of the medical reports indicates his respiratory problems are progressive. It is further noted that with one exception the progression, if any, of the chest disease is not described. The court suggests that, if another action is filed in connection with this claim, the record be made up to indicate the extent of progression of plaintiff's chest ailments.

An order is this day entered consistent with this opinion.